MAX N. TOBIAS, JR., Judge.
_JjThe defendant, Rory Dimes (“Dimes” or “the defendant”), was charged on 19 November 2012 by bill of information with one count of a felon in possession of a firearm, one count of possession with intent to distribute heroin, and one count of possession of oxycodone, to which he entered pleas of not guilty at his arraignment. On 29 November 2012, he filed a motion to suppress evidence, statement, and identification, as well as a motion for preliminary examination, exculpatory and impeachment information, and an omnibus motion for discovery.
On 24 September 2013, the trial court denied the motion to suppress the evidence. A jury trial was held on 22 Sep *1265 tember 2014 and the defendant was found guilty as charged as to all three counts. At his 3 October 2014 sentencing, Dimes was sentenced (a) to twenty years at hard labor without the benefit of parole, probation, or suspension, but with credit for time served, to run concurrently with the other counts herein and with other sentences on Count One (felon in possession of a firearm); (b) to fifty years at hard labor to run concurrently with the other counts herein and with other sentences without the benefit of probation or suspension, but and with credit for time served on Count Two (possession with intent to distribute heroin); and (c) to five years at hard labor to run concurrently |¿with the other counts herein and with other sentences, but with credit for time served, on Count Three (possession of oxycodone).
At a 13 January 2015 multiple bill hearing, Dimes entered a plea of guilty as a fourth offender with respect to Count Three. The trial court vacated his earlier sentence on Count Three and sentenced him to forty years at hard labor, with credit for time served, to run concurrently with other sentences, pursuant to La. E.S. 15:529.1.
On 10 September 2015, the trial court granted the defendant an out-of-time appeal pursuant to his pro se application for post-conviction relief.

FACTS

Probation and Parole Agent Amy Gisel-son testified at trial.[1] She stated that during the daytime of 24 September 2012, she performed a residence check with Agent Amy Richard at the defendant’s home in conjunction with the defendant’s status as a probationer. After she and Agent Richard knocked on the door and received no answer, they began walking back to their car. Dimes called out to Agent Giselson, and she and Agent Richard turned around to see the defendant and Penny Hicks, Dimes’ girlfriend, standing in the doorway.
Dimes invited the agents into the house, and the agents walked through the residence. As the agents walked through the bedroom area, Agent Giselson observed approximately $1,900.00 in cash on the bedside nightstand. Agent Giselson testified that the defendant was unemployed at the time of this residence check. Accordingly, she asked the defendant how he obtained the money, and he | ^responded that he won it playing dice.[2] Agent Gisel-son stated that Dimes’ response gave her reasonable suspicion to believe that he was engaged in criminal conduct because he was not supposed to be gambling.
Agent Giselson further testified that because she had reasonable suspicion to believe that the defendant was engaged in criminal conduct, she began a search of his residence. She opened the top drawer of the defendant’s bedside nightstand and found a black semi-automatic handgun and over $25,000.00. After this discovery, she handcuffed the defendant and advised him that he was in violation of his parole for possessing a firearm. Agent Richard took *1266 control of the firearm and made it safe. The agents escorted Dimes and Ms. Hicks downstairs and notified a supervisor so that additional probation and parole officers could be dispatched to the residence. Agent Giselson stated that her supervisor gave the officers permission to search the remainder of the residence.
■ In her continued search of the residence, Agent Giselson searched a pair of men’s pants that were on a chair near the side of the bed where the agents found the large sums of money. In the pants, which Ms. Hicks identified as the defendant’s, Agent Giselson found four white pills with the imprint of “512” that she testified were later identified as oxycodone pills. She testified that Agent Richard also located a white pill imprinted with “512” on the floor between the bed and the chair. ' Agent Richard also found approximately seventeen grams of heroin pin an oven mitt, and Agent Justin Green found methadone and a scale in the kitchen cabinet.
Agent Giselson testified that Dimes was read his Miranda rights.[3] The defendant elected to fill out the waiver of rights form, and he also made a written statement that the drugs were his, and the firearm was for his personal protection. The agent testified that she spoke to Ms. Hicks, who also stated that'the firearm, drugs, and cash were not hers.
Probation and Parole Agent Amy Richard testified regarding her participation in Dimes’ residence check and arrest. Her testimony was substantially similar to that of Agent Giselson with regard- to the search of the defendant’s bedroom. With regard to. her search of the kitchen, Agent Richard stated .that she began her inspection by attempting to open the kitchen cabinets, but two oven mitts were tacked on the front of the cabinets.- The mitt on the right was flat, while the mitt on the left “was kind of open making a pouch;” when she put her hand inside the mitt she “retrieved a large bag of white powder.”
Agent Richard testified that she subsequently opened the kitchen cabinets and observed “various paraphernalia, a box, a little wooden box that opened up just to have little vials of things that looked l[ike] oils or chemicals.” Additionally, she stated that “[t]here were Ziploc bags that were filled with just a white substance, a powdery substance, that [she] believed was not drugs” but looked like baking soda. She also observed Ziploc bags that were filled with Kool-Aid and a bottle of Manni-tol. Agent Richard identified the objects she found during her search of the defendant’s kitchen, including two small scales and a calculator.
pKori Keaton testified as a previous detective with the project safe neighborhood for the special operations division of the New Orleans Police Department (“NOPD”) that would conduct narcotics investigations. Mr. Keaton testified that on the date of the residence check, he received a telephone call from probation and parole that one of their parolees was detained at 1918 Amelia Street, New Orleans, with a firearm and some narcotics. He stated that he located to the residence to gather facts from the parole agents and recover evidence. With respect to the defendant’s case, Mr. Keaton testified that he recovered five white pills imprinted with “512”, which “is typical of oxycodone.” He also recovered a. clear plastic bag that contained what he believed was heroin, “arid then it was proved positive through a *1267 NIK kit by Parole- Officer Justin Green.” He also collected a bottle of Mannitol.
Mr. Keaton testified that he interviewed Dimes and asked him how long he resided at that residence, to which he replied “two to three years.” He also asked the defendant whether Ms. Hicks’ children (who were not present during the residence check) were his, and he responded in the negative. He stated that he asked the defendant whether the firearm found on the nightstand in the bedroom belonged to him, and he replied that it did, “reiterating] that Ms. Hicks didn’t have anything to do with the guns or the drugs.” Additionally, Mr. Keaton asked Dimes what was in the clear plastic bag, and he responded that it was heroin. Mr. Keaton identified in open court the voluntary written statement made by the defendant, as well as the waiver of rights form.
James Huey, an employee of the Orleans Parish Sheriffs Office telecommunications department who manages the inmate phone system and is the custodian of the phone records, also testified. Mr. Huey reviewed a call detail | (¡sheet that was generated with respect to the defendant, and a recording was played -for the jury.[4]
NOPD Officer George Jackson testified as an expert in taking, examination, and comparison of fingerprints. ' Officer Jackson testified that the fingerprints he examined on Dimes’ bill of information matched the fingerprints on the defendant’s other certified packets of conviction.

ERRORS PATENT

A review pursuant to La. C.Cr.P. art. 920(2) reveals one error patent. With respect to Count One, felon in possession of a-firearm, the transcript evidences that the trial court failed to impose a fine for the violation of La. R.S. 14:95.1. Accordingly, we are required to remand- the matter to the trial court for imposition of the -mandatory fine. See State v. Patin, 14-0510 (La.App. 4 Cir. 5/20/15), 171 So.3d 959.

DISCUSSION

Dimes’ asserts in his sole assignment of error, that the evidence seized, after a war-rantless search, should have been suppressed.- Specifically, he argues that the presence of a large.amount of cash in his apartment, which he earned playing dice, was not sufficient to provide reasonable suspicion, and Agent Giselson assumed that he had obtained the cash as a result of criminal activity.
The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution protect people against unreasonable searches and seizures. Ordinarily, when evidence is seized without a warrant, the burden is on the state to demonstrate that a search is justified by some exception to the warrant |7requirement. La. C.Cr.P. art. 703 D; State v. Bell, 09-0574, p. 4 (La.App. 4 Cir. 12/9/09), 28 So.3d 502, 506 (citation omitted).
Pursuant to La. C.Cr.P. art. 895 A(4), as a condition of probation, the probationer must “[p]ermit the probation officer to visit him at his home or elsewhere.”' Additionally, pursuant to La. C.Cr.P. art. 895 A(13)(a), a probationer agrees to warrant-less searches by a probation officer when the officer has reason to believe that the person is involved in criminal activity:
When the court places a defendant on probation, it shall require the defendant to refrain from criminal conduct and to pay a supervision fee to defray the costs *1268 of probation supervision, and it may impose any specific conditions reasonably related to his rehabilitation, including any of the following. That the defendant shall:
⅜ * *
(13)(a) Agree to searches of his person, his property, his place of residence, his vehicle, or his personal effects, or any or all of them, at any time, by the probation officer or the parole officer assigned to him, with or without a warrant of arrest or with or without a search warrant, when the probation officer or the parole officer has reasonable suspicion to believe that the person who is on probation is engaged in or has been engaged in criminal activity.
Dimes concedes that parolees have a diminished , expectation of privacy, citing State v. Malone, 403 So.2d 1234, 1240 (La.1981); see also State v. Marino, 00-1131, p. 4 (La.App. 4 Cir. 6/27/01), 804 So.2d 47, 52. “This reduced expectation of privacy is based on a probationer’s conviction and agreement to allow a probation officer to investigate his activities in order to confirm .that the probationer is in compliance with the provisions of his probation.” State v. Fields, 12-0674, p. 9 (La.App. 4 Cir. 6/19/13), 120 So.3d 309, 317 (citing State v. Thomas, 96-2006, p. 2 (La.App. 4 Cir. 11/06/96), 683 So.2d 885, 886). Accordingly, this reduced expectation of privacy “allows reasonable warrantless | ^searches of their persons and residences by their probation or parole officer, even though less than probable cause may be shown.” State v. Jones, 12-0438, p. 8 (La.App. 4 Cir. 3/13/13), 119 So.3d 9, 15 (citing Malone, 403 So.2d at 1238).
This court has recognized that a probationer is not subject to the unrestrained power of the authorities, and “a search of the probationer may not be a subterfuge for a police investigation.” Fields, 12-0674, p. 9, 120 So.3d at 317 (quoting Thomas, 96-2006, p. 2, 683 So.2d at 886). However, “a probation officer may conduct a warrantless search of a probationer’s property when ‘the officer believes such a search is necessary in the performance of his duties, and must be reasonable in light of the total atmosphere in which it takes place.’ ” Id. “In order to determine reasonableness we must consider ‘(1) the scope of the particular intrusion, (2) the manner in which it was conducted, (3) the justification for initiating it, and (4) the place in which it was conducted.’ ” Id.
Dimes argues that the third consideration, the justification for initiating the warrantless search, is at issue in this case, as having a large amount of money from playing dice is insufficient evidence of criminal activity and therefore could not justify a warrantless search of his residence. He contends that Agent Giselson assumed that playing dice was illegal pursuant to La. R.S. 14:90 A rather than legal pursuant to La. R.S. 14:90 C.[5] Because *1269 there was a chance that the defendant won |9the money legally, he submits that Agent Giselson did not have reasonable suspicion to conclude that he had been engaged in criminal activity. Dimes further argues that Agent Giselson failed to ask him whether he played dice at a casino or at an unlicensed venue. He asserts that her assumption that the game was illegal was unreasonable, and therefore, the evidence seized pursuant to the warrantless search should have been suppressed.
At the preliminary hearing in Jones, supra, a probation and parole officer testified that while conducting a routine residence check on the defendant, Jones, the door was answered by a Ms. Kathy Guy, who was the mother of Rondell Guy (another probationer) as well as Jones’s custodian. Upon being asked about Jones and Rondell Guy, Ms. Guy directed the officers upstairs towards the bedrooms. When the officers entered Jones’? bedroom, they observed Jones and a juvenile asleep in bed, with Jones sleeping on the left side of the bed. The officers asked the juvenile to step out of the room for officer safety. After the juvenile left the 'room, the officers handcuffed Jones and relocated him downstairs.
The officers conducted a search of the bedroom, at which time they discovered a loaded 9 mm handgun under the left side of the mattress and a box of [in38 caliber ammúnition under the left side of the bed. Thereafter, the officers discovered a grinder (used for marijuana) and a small scale on the dresser. The officer who discovered the gun testified that six individuals lived at the residence, and he did not ask to whom the gun belonged. At the hearing on Jones’ motion to suppress the evidence, another officer who assisted in the residence check testified that one of the reasons for the check was “because the defendant had violated his probation by living at the same address as Rondell Guy, another probationer.” Jones, 12-0438, p. 5, 119 So.3d at 14. Jones pled guilty to attempted possession of a firearm by a felon.
On appeal, Jones argued, inter alia, that the trial court erred in denying his motion to suppress the evidence because the officers had no authority to conduct a war-rantless search of his residence absent the reasonable suspicion of criminal activity. Jones conceded that the officers had information, that he violated his probation at the time of the residence check. With regard to the officers’ search of his bedroom, this court found that “[i]t was not until the officers searched the defendant’s belongings that Officer Bertrand stated that he discovered the paraphernalia.” Id., p. 13, 119 So.3d at 18. We recognized that “[h]ad the officers initially observed the grinder and the scale on Jones’ dresser upon entering the bedroom, the evidence would; have fallen under the plain view exception and given the officers reasonable *1270 suspicion to believe the defendant was engaged in criminal activity to conduct a search.” Id.
However, “[n]either testimony frorri the officers nor evidence introduced at the hearing indicated that there was reason to believe the defendant was involved in criminal activity prior to the search.” Id., p. 14, 119 So.3d at 18. Rather, “[t]he only reasons articulated for visiting the defendant’s residence and conducting the |„search was for a routine residence check and because the defendant was living With another probationer,” which this court found to be “insufficient grounds for a search of the defendant’s personal effects under La. C.Cr.P. [a]rt. 895(A)(13)(a).” Id., p. 14, 119 So.3d at 18-19. Additionally, we held that “the state did not provide documentation at the hearing that the defendant agreed to a search of his residence without the requisite reasonable suspicion as a condition of his probation,” and therefore, “the state [ ] failed to prove the war-rantless search of the defendant’s room was reasonable under the circumstances.” Id., p. 14,119 So.3d at 19.
Ultimately, however, the Jones court concluded that although the state failed to prove that .the search was reasonable under the circumstances, the evidence seized was admissible pursuant to the inevitable discovery doctrine, and affirmed the trial court’s denial of Jones’ motion to suppress. On application for rehearing, we amended the opinion for clarification “to delete any suggestion that the search incident to arrest exception [wa]s applicable,” emphasizing that “the search incident to arrest exception does not apply here because the defendant .was handcuffed and downstairs.” Id., p. 20, 119 So.3d at 22-23. Further on rehearing, we Reiterated that “[t]he probation' officers did not have the requisite reasonable suspicion of criminal activity when the officers initially arrived at the defendant’s residence,” and the officers “only knew that the defendant was living with another probationer, a violation of his probation.” Id., p. 20, 119 So.3d at 22-23. Therefore, “without reasonable suspicion of criminal activity, a warrantless search .of his personal effects was unjustified.” Id., p. 20, 119 So.3d at 23. The Jones court further clarified that although the officers observed the drug paraphernalia after the discovery of the gun and ammunition, because the paraphernalia was in plain view, the officers would have inevitably discovered the.evidence seized launder Jones’ mattress and bed, and the trial court’s denial of Jones’ motion to suppress was not an abuse of discretion.
■ In Fields, supra, the defendant, a convicted felon, was visited by probation officers performing a residence check after Fields failed to appear for his first meeting with the probation officer assigned to-him. When the officers knocked on the door of the residence identified by Fields, a male voice asked who was there, and the officers answered, “Probation.” Fields, 12-0674, p. 5, 120 So.3d at 315. The officers asked the man to open the door, and the officers entered, asking Fields why he missed his appointment. Fields responded that he had forgotten about it.. The officers noticed, a female who was later identified as Fields’ girlfriend standing in the hallway. One of the, officers asked which bedroom belonged to Fields, and the girlfriend responded that “they could not go in there.” Id. The officers explained their right to perform the residence check, and one of the officers entered the bedroom as the defendant advised the officers that he would be changing his address because he. and his girlfriend were not getting along. As the officer entered the bedroom, he observed the handle of a pistol in plain view between the mattress and the box spring of the bed; he secured the weapon, which was loaded. Fields stated that he *1271 knew to whom the weapon belonged, and he volunteered to “take the charge.” Id., p. 6,120 So.3d at 315. Approximately nine pair of men’s shoes and several men’s shirts were in the bedroom. Fields was convicted of being a convicted felon in possession of a firearm, adjudicated a second felony offender, and sentenced to ten years.
On appeal, Fields argued, inter alia, that the trial court abused its discretion in denying his motion to suppress the evidence. In considering the assignment of error, we recognized that although Fields indicated at the time of the officers’ | ^residence check that he would be moving, at the time of the officers’ visit, he was still residing with his girlfriend at the address he provided, as evidenced by the men’s clothing in the bedroom. The Fields court found that, as part- of -the officers’ residence check to determine whether the defendant was living there, the officers observed the handle of the pistol in plain view, and at that point, -pursuant to the plain view doctrine, the officers had the right to seize the weapon. Accordingly, the court found that because Fields did not have a reasonable expectation of privacy, for the pistol was observed in plain view and the officers had the right to seize the weapon without a warrant.
In Malone, supra, the defendant was on probation, and his probation officer, John Laird, arrived at Malone’s residence to make his first residence check and knocked on the front door. After receiving no answer, Mr. Laird returned to his automobile that was parked in the defendant’s driveway. As the officer returned to his vehicle, he observed “a garden hose stretching from defendant’s house into a wooded area.” Malone, 403 So.2d at 1236. Mr. Laird was aware that “there was considerable cultivation of ‘contraband’ being done in the area,” and he “followed the hose into the wooded area where he discovered what appeared to be growing marijuana.” Id. After other officers arrived and Malone was read his Miranda rights, the defendant conceded “he had harvested one or two plants for himself;” he was arrested for probation violation.
On-appeal, the Supreme Court recognized that the probation officer “was following established and permissible procedure when he went to visit defendant” and “had no prior information that defendant was engaging in prohibited activity nor did he learn of the activity at an earlier visit and return later to search for contraband,” although he was aware that contraband was being cultivated in the | uarea. Id. at 1239. In finding that the trial court properly denied the- motion to suppress the evidence, the Court held:
[Mr. Laird] was suspicious when, he saw a.garden hose attached to a faucet on defendants house leading to a wooded area. He had a rjght to be knocking on defendant’s door and. have his car parked in defendant’s driveway. The garden hose was in his view from the driveway. We have no doubt that subjectively defendant may have expected the marijuana plants not to be discovered they were located in a wooded area and one had to cross a fence to reach their location. Nevertheless, once Mr. Laird (with his knowledge of marijuana cultivation in the area and his knowledge of defendant’s past involvement with- drugs) sáw the garden hose leading into the woods, he had’ sufficient reason to follow the hose and learn why it was in that strange location. He certainly had an articulable and reasonable explanation for going into the woods to trace the garden hose.
Although Mr. Laird did . cross a fence before he discovered the marijuana plants, the search was not espe- *1272 dally intrusive. Laird did not force open a locked door or rummage for several hours through defendant’s possessions. We certainly do not consider this search to be a subterfuge for criminal investigation. The search was not initiated at the suggestion of the police; they only became involved following a phone call from the parole officer. Indeed the search which resulted in finding the marijuana was completed before the police were contacted. [Emphasis supplied.]
Id. at 1240 (footnote omitted).
Pursuant to La.' C.Cr.P. art. 895 A(13)(a), a probation officer must have “reasonable suspicion to believe that the person who is on probation is engaged in or has been engaged in criminal activity.” However, if officers observe an object that has an incriminating nature which is immediately apparent, the object may be seized without a warrant pursuant to the plain view doctrine. Jones, 12-0438, pp. 13-14, 119 So.3d at 19 (citing State v. Norals, 10-0293, p. 5 (La.App. 4 Cir. 7/30/10), 44 So.3d 907, 910); see also Fields, 12-0674, p. 11, 120 So.3d at 318.
|]CIn the case before us, the large amount of cash on the nightstand was within plain view. We find the large sum of money that Dimes asserted was a result of playing dice was “immediately apparent” to have an incriminating nature; thus, the money falls under the plain view exception. See Jones, 12-0438, pp. 13-14, 119 So.3d at 19 (citing Norals, 10-0293, p. 5, 44 So.3d at 907).[6] Additionally, “[w]hen a search is conducted for probation violations, the state’s burden is met when it establishes that there was a reasonable suspicion that criminal activity was occurring.” State v. Ross, 13-2069 (La.9/18/13), 127 So.3d 908.
Although Agent Giselson’s residence check was not premised on a suspicion that Dimes was engaged in criminal activity, as was the case in Jones, the large amount of cash on Dimes’ dresser in plain view was sufficient to establish a reasonable suspicion that criminal activity was occurring. Agent Giselson testified that she was suspicious when she saw the large amount of money because she was aware that the defendant was unemployed at the time of her visit. Upon being questioned by Agent Giselson as to the source of the cash, Dimes responded that the money was obtained as a result of playing dice, which, although Agent Giselson did not ask Dimes whether it was obtained legally or illegally, could have been obtained via illegal gambling. Additionally, at trial, Agent Giselson testified that the defendant “did not say anything about a casino.”
Further, the Supreme Court’s reasoning in Malone is applicable. In Malone, the mere presence of a garden hose leading into a nearby wooded area is not itself | lflevidence of criminal activity. However, the Court reasoned that the probation officer, who, like Agent Criselson, “had no prior information that defendant was engaging in prohibited activity,” had reason to be in the defendant’s driveway and had “knowledge of marijuana cultivation in the area” as well as “knowledge of defendant’s *1273 past involvement with drugs.” Therefore, when the officer “saw the garden hose leading into the woods, he had sufficient reason to follow the hose and learn why it was in that strange location.” Malone, 403 So.2d at 1239-40. Although the search in Malone was arguably less intrusive than in the instant case (because the probation officer had not yet entered the defendant’s home), the probation officer in Malone had to follow the hose, cross a fence, and enter a wooded area before observing the marijuana plants.
Thus, Agent Criselson’s knowledge of Dimes’ admitted unemployment, together with the large sum of cash in plain view that Dimes averred was from playing dice, which was possibly a form of illegal gambling, was sufficient to establish reasonable suspicion of criminal activity, and therefore, the warrantless search of the defendant’s residence was valid. Accordingly, we find that the trial court’s ruling denying the defendant’s motion to suppress the evidence should be affirmed.
As to the defendant’s motion to supplement the record with the juror verdict forms because the trial court failed to inform the jury at trial that not guilty was a possible verdict as to Count Two, we find that this argument lacks merit. The record was supplemented with the juror verdict forms, which establishes that as to Count Two, the jurors were provided the option of choosing not guilty as a verdict. | ^Additionally, a review of the trial transcript evidences that counsel for Dimes failed to object to the trial court’s omission of a possible not guilty verdict as to count two. Accordingly, the issue was not preserved for this court’s review on appeal. See La. C.Cr.P. art. 841 (“An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.”).

CONCLUSION

For the foregoing reasons, the trial court’s ruling denying Dimes’ motion to suppress evidence is affirmed. Further all of the convictions and the sentences are affirmed; however, we remand this matter for the imposition of the mandatory fine as to Count One.
AFFIRMED; REMANDED FOR IMPOSITION OF FINE.
LOMBARD, J., concurs in result.

. Her testimony was substantially similar to her testimony at the hearing on Dimes’ motion to suppress the evidence.

. At trial, when asked whether the defendant indicated where he was playing dice, Agent Giselson responded that the defendant did not. Regarding rules for parolees, Agent Gi-selson explained that ‘‘[p]arolees are to refrain from engaging in criminal conduct and playing dice is gambling, which is illegal conduct." On cross-examination, when asked whether she asked the defendant whether he won the money playing dice on the streets, Agent Giselson responded, “No sir, I did not and he did not say anything about a casino and so it is reasonable for me to believe that he was engaged in criminal conduct."

. Agent Richard testified at trial that she was present when Agent Giselson read the defendant his Miranda rights.

. The recording is not part of the record on appeal. However, such is immaterial as it was. not assigned as error. -• See La."C,Cr.P, art. 920.

. La. R.S. 14:90 provides, in pertinent part:
A. (l)(a) Gambling is the intentional conducting, or directly assisting in the conducting, as a business, of any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value in order to realize a profit.
(b) Whoever commits the crime of gambling shall be fined not more than five hundred dollars, or imprisoned for not more than six months, or both.
(2) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than twenty thousand dollars, or imprisoned with or without hard labor, for not more than five years, or both when:
(a) R.S. 14:90 is violated.
(b) Five or more persons are involved who conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business.
*1269 (c) Such business has been in or remains in substantially continuous operation for a period of thirty days or more or, if the continuous operation is for less than thirty days, has a gross revenue of two thousand dollars in any single day.
[[Image here]]
C. The conducting or assisting in the conducting of gaming activities or operations upon a riverboat at the official gaming establishment, by operating an electronic video draw poker device, by a charitable gaming licensee, or at a pari-mutuel wagering facility, conducting slot machine gaming-at an eligible horse racing facility, or the operation of a state lottery which is licensed for operation and regulated under the provisions of Chapters 4 and 11 of Title 4, Chapters 4, 5, 7, and 8 of Title 27, or Subtitle XI of Title 47 of the Louisiana Revised Statutes of 1950, is not gambling for the purposes of this Section, so long as the wagering is conducted on the premises of the licensed establishment.

. Cf. State v. Candebat, 13-0780, pp. 12-13 (La.App. 4 Cir. 1/30/14), 133 So.3d 304, 312 (“The 'plain feel1 exception is analogized to the plain view exception, which does not require an officer to actually know that the object is contraband, but rather only requires that the officer have probable cause to believe that the item in question is contraband.”). "Technically, the ‘plain view’ exception to the requirement of having a search warrant is not really an exception since it is premised on the idea that no ‘search’ even occurred.” State v. Bridges, 11-1666, n. 4 (La.App. 4 Cir. 11/28/12), 104 So.3d 657 (citing State v. Dowling, 387 So.2d 1165, 1169 (La.1980)).